IN THE UNITED STATES DISTRICT COURT

OF WESTERN PENNSYLVANIA


ALBERT T. CARLISLE,                    CIVIL   DIVISION

            Plaintiff,                 No. 04-284 ERIE

        vs.

MATSON LUMBER COMPANY,
MATSON HARDWOODS, INC.,

            Defendants.
        _____


        Transcript of EVIDENTIARY HEARING RE: JURISDICTION
                commencing on OCTOBER 21, 2005
        United States District Court, Pittsburgh, Pennsylvania
          BEFORE:  HONORABLE GARY L. LANCASTER, DISTRICT JUDGE


APPEARANCES:

For the Plaintiff:              James Fryling, Esq.
                                The Bell Telephone Building
                                17 West Tenth Street
                                P.O. Box 860
                                Erie, PA  16512-0860


For the Defendant:              Robert P. Ging, Jr., Esq.
                                2095 Humbert Road
                                Confluence, PA  15424-2371



Court Reporter:                 Karen M. Earley, RDR-CRR
                                619 U.S. Courthouse
                                700 Grant Street
                                Pittsburgh, PA  15219
                                412-201-2660



Proceedings reported by mechanical stenography.
Transcript produced by computer-aided transcription.

I N D E X

P R O C E E D I N G S

1
2  (In open court.)

3          THE COURT:  Good afternoon.  This is the time we
4  set to have an evidentiary hearing in the matter captioned
5  Albert T. Carlisle versus Matson Lumber Company and Matson
6  Hardwoods at Civil Action No. 04-284.

7          I think the parties are familiar with the
8  background of this case.  My thinking was once the summary
9  judgment motions were resolved and the lion share of this case
10 had been dismissed, then I have questions of whether or not we
11 have jurisdiction.  Who objected?  Somebody asked for
12 reconsideration?  Was that you?

13         MR. FRYLING:  Yes.  We filed a motion for
14 reconsideration.

15         THE COURT:  I understood your motion and understood
16 the basis for it.  Generally, I think you are right.  There
17 are some exceptions.  I'm going to file a written memorandum
18 in due course explaining why I'm denying your motion for
19 reconsideration.

20         Now, is there any testimony that plaintiff, either
21 one of you, have to establish the jurisdiction?

22         MR. FRYLING:  I am James Fryling, and I represent
23 Albert Carlisle, the plaintiff.

24         THE COURT:  You have to establish -- is it a lien?
25 What is it that is clouding the title?

1          MR. FRYLING:  Your Honor, it is the quit claim deed

2    that was filed in May of 2003 from the Estate of Marion C.

3    Kincaid to Matson Lumber Company.

4          THE COURT:  Okay.

5          MR. FRYLING:  So it's that quit claim deed that was

6    filed as of record in May 2003.  That quit claim deed

7    allegedly and, of course, quit claim deeds doesn't transfer

8    any title, but the estate of Marion Kincaid gave a quit claim

9    deed to Matson Lumber Company purporting to give any interest

10   that the estate had to all the timber and trees on the

11   Carlisle farm.  That's the document that is at issue.

12         We have -- of course, part of our quiet title claim

13   is the Court should rule that document is not valid and should

14   have that document, that deed stricken from the recorder's

15   office, and that's the basis of the remaining claim that's

16   here.

17         As I understand it, the property that that quit

18   claim deed encompasses in this case would be all of the timber

19   and trees on the property subject to the 1995 jury verdict

20   that was rendered in Federal Court on the issue of what trees

21   did Matson get when they reserved the timber and trees in the

22   sale to Carlisle.

23         THE COURT:  Okay.

24         MR. FRYLING:  I believe, Your Honor -- I don't have

25   the verdict in front of me, but my understanding of the result

1  of that case was that essentially the jury decided that Matson

2  got in that transaction the timber and trees that were in

3  existence on the date of sale, and that all future trees,

4  whether planted by Carlisle or whether they sprouted

5  naturally, would become the property of the property owner,

6  Mr. Carlisle, who is my client.

7          There was also an issue in this case with regard to

8  a buffer as it were, a no-cut zone I believe is the term that

9  was used in the prior case, that was ultimately determined by

10  the jury as a hundred feet on either side by a waterway.  I

11  believe that was the basis for the jury's award of damages to

12  Mr. Carlisle in that 1995 case.

13          There was an issue presented to the jury that

14  timber had been taken out of that no-cut zone or that buffer.

15  There was testimony as to the value of that timber, and

16  ultimately the jury verdict was rendered, which was upheld by

17  the Third Circuit Court of Appeals.

18          There has subsequently been a lot of discussion

19  between the parties, Mr. Carlisle and Matson Lumber Company,

20  regarding just exactly what the jury determined what the

21  meaning of a waterway is or a water course, whether the jury

22  meant to say that those trees belonged to Mr. Carlisle,

23  whether those trees still belong to Matson Lumber Company, but

24  Matson Lumber Company simply can't cut those trees.  There's a

25  lot of issues still floating around as to what the resolution

1    of that is.

2           I think in my opinion, Your Honor, because I tried

3    to understand what occurred in 1995 and 1996, and the issues

4    in light of the Court's ruling that are left open, and that is

5    what timber and trees would be at issue subsequent to 1995 in

6    light of the quit claim deed that was filed in 2003.

7           That would be in my opinion, Your Honor, the value

8    of the trees that sprouted since May of 1969 and also the

9    value of the trees and the waterways.  I say that for two

10   reasons.  One, because if Matson's position is contrary to

11   what the jury determined or if Matson's position is by virtue

12   of this quit claim deed, we have title to the timber and trees

13   in those buffer areas, that quit claim deed would assert title

14   over those as well.

15          If we're correct and that the buffer area was meant

16   to cover the waterways and that as a result of that, that's

17   property of Carlisle, then the quit claim deed would be

18   adverse to that claim as well.  So I think that's my reasoning

19   for saying it.

20          I think at issue is not only just the timber and

21   trees that sprouted in '69 but also this controversy

22   concerning what is a waterway and who owns the tree sprouting

23   in the waterway.  Those issues still need to be resolved.

24          We will be presenting expert testimony essentially

25   on the value of the timber and trees that have sprouted on the

1    property since 1969 and also separately, also, the value of

2    the timber in these no-cut zones or these buffer areas, so two

3    opinions, and however the Court decides, we'll have two

4    figures from which to draw from.

5              THE COURT:  What are the two figures?

6              MR. FRYLING:  The first figure, if I recall off the

7    top of my head, is in the area of $330,000.  Would that be

8    correct?  I don't have them memorized.

9              The other figure currently just for the waterways

10   going from two landmarks on the property, a mailbox to another

11   area is in excess of $75,000 just for one portion of the

12   buffer along I believe it's the Brokenstraw Creek.

13             THE COURT:  Do you know if any consideration was

14   passed in exchange for this quit claim deed?

15             MR. FRYLING:  I have no idea.  Only what is cited

16   in the document itself, and I believe, if I may, I believe

17   it's one dollar and other good and valuable consideration, but

18   I have the quit claim deed here.

19             MR. GING:  Mr. Fryling is correct on that.

20             MR. FRYLING:  Thank you.  I believe it's one dollar

21   and other good and valuable consideration.

22             THE COURT:  Okay.  So your expert is at counsel

23   table?

24             MR. FRYLING:  Yes.

25             THE COURT:  What is his name?

1          MR. FRYLING:  James Hall.

2          THE COURT:  If he would testify, he would testify

3   the quit claim deed reduces the value by a minimum of $75,000

4   and perhaps up to $300,000?

5          MR. FRYLING:  No.

6          THE COURT:  Okay.

7          MR. FRYLING:  The value of the timber that is on

8   the property itself that's at issue under the umbrella of this

9   quit claim deed, the timber that sprouted since 1969, May of

10  1969, approximate value of $330,000, and with regards to the

11  timber that may have sprouted before 1969 but is with the

12  jury's no-cut zone and the ownership of that timber, that

13  timber would exceed, I believe, just the calculation that he

14  based on Brokenstraw Creek is 78,000, 75,000.

15         THE WITNESS:  You told me we needed at least 75,000

16  along Spring Creek.  I did one side of the Spring Creek a

17  short distance and came up with almost a hundred thousand.

18         MR. FRYLING:  $100,000, and that's one of three

19  waterways that are on the property.

20         THE COURT:  Okay.  Does the defense have any

21  testimony to dispute these figures?

22         MR. GING:  We are not prepared to put on any

23  testimony, Your Honor, at this time.

24         THE COURT:  This is the time to do it.

25         MR. GING:  I understand, Your Honor.  We don't

1    agree with the value of the timber sprouted since 1969, Your

2    Honor, but Mr. Fryling and I have worked very closely on this

3    case to try and frame the issues and resolve the issues, and

4    one of the reasons that we're not prepared to put on testimony

5    today is we share Mr. Fryling's concern that once the Court

6    has jurisdiction, even if the value of the case is reduced as

7    it was in this case with the motion for summary judgment, that

8    the Court still has jurisdiction.  And when he filed his

9    motion for reconsideration, I reviewed the case law, and I

10   couldn't find case law that convinced me that he was wrong.

11          So we agree with Mr. Fryling's legal position that

12   he had in excess of the jurisdictional amount in the case

13   before the Court rendered summary judgment, and the fact that

14   even if our testimony shows that the value left in controversy

15   is less than $75,000, that that wouldn't be out of the

16   jurisdiction of the Court.

17          So because I agree with his analysis of the law, we

18   chose not to put on any testimony to contradict Mr. Hall.

19          THE COURT:  Okay.  Was an expert report developed?

20          MR. FRYLING:  Your Honor, I had prepared an

21   affidavit for Mr. Hall, which he signed.  I'm embarrassed to

22   tell the Court it's sitting on my desk in Erie.  I grabbed the

23   wrong file.  It is done, and it is prepared.  I have all

24   intensions of filing it in record of the Court.  I would be

25   happy to do that as soon as I get back to Erie.

1        THE COURT:  You can send it in.  Would you want to

2   cross-examine?

3            MR. GING:  I will cross-examine, Your Honor.

4            THE COURT:  Okay.  Take the stand, sir.

5        **JAMES HALL, PLAINTIFF'S WITNESS, WAS SWORN.**

6            THE COURT:  I'm going to accept your proffer on

7   what he would testify to on direct, if called, and you

8   proffered that the figure would be one that would be around

9   $300,000?

10           MR. FRYLING:  Correct.

11           THE COURT:  And the other would be in excess of 75,

12  up to maybe a hundred thousand?

13           MR. FRYLING:  Correct.

14           THE COURT:  I'm accepting that.  I am giving you an

15  opportunity to challenge it if you want to.

16           MR. GING:  Thank you, Your Honor.

17                      CROSS-EXAMINATION

18  BY MR. GING:

19  Q.  May it please the Court, Mr. Hall, your college degree is

20  in forest management, is that correct?

21  A.  That's correct.

22  Q.  You are not a licensed appraiser in the Commonwealth of

23  Pennsylvania?

24  A.  I am not a licensed appraiser.

25  Q.  You would agree, would you not, that timber means

1    merchantable timber, that is, trees that are standing in the

2    forest?

3    A.   Merchantable means trees that have a value, yes.

4    Q.   You would agree, would you not, that under the jury

5    verdict rendered in this case as far as the cases today,

6    Matson owned all of the timber standing and falling that was

7    on the property in 1969?

8    A.   I understand the jury verdict to be just that timber that

9    is not in the waterways.

10   Q.   Yes.  Okay.  And the waterways in this case would be

11   Spring Creek, Brokenstraw Creek, and Toms Run?

12   A.   No, sir.  Waterways would be all waterways.

13   Q.   Your counsel said there were three waterways in his

14   proffer to the Court.  Are there other waterways than those

15   three on the property?

16   A.   Many, many.  Hundreds.

17   Q.   Hundreds?

18   A.   Hundreds.

19   Q.   Has Matson timbered in those waterways previously, the

20   other waterways beside the others I mentioned?

21   A.   He did.

22   Q.   Was any objection made to that timbering previously?

23   A.   Yes.

24   Q.   Is there anywhere on the property that there aren't

25   waterways?

1    A.    Yes.

2    Q.    As you define them?

3    A.    I didn't define them.  They were defined by Matson

4    himself.

5    Q.    Okay.  How did that occur, sir?

6    A.    After the court hearing, he sent his people in, and they

7    logged all the waterways, a hundred feet on both sides of

8    them, and then they went in and logged from a blow-down

9    salvage, and they stayed out of those areas, yes.

10    Q.    If we can come back to the definition of merchantable

11    timber, and I just want to deal with timber outside of

12    waterways.  You would agree, would you not, that Matson owns

13    all of the timber from roughly seven inches and up in

14    diameter, would you not?

15    A.    No.

16    Q.    What do you think the cut-off is between the timber owned

17    by Matson and timber allegedly owned by Mr. Carlisle?

18    A.    You're asking for my opinion?

19    Q.    Yes.

20    A.    I don't think Mr. Matson owns any timber on the property.

21    Q.    Okay.  Is your testimony here today going to be based on a

22    value of all of the existing timber on the property regardless

23    of whether it was before 1969 or after 1969?

24    A.    No, sir.

25    Q.    What is your testimony based on in terms of the $330,000?

A.   What I was instructed to do was inventory those trees not in the waterway that germinated after 1969, and that's what I did.

Q.   All right.  Are any of those trees over seven inches?

A.   There were some, yes.

Q.   How did you determine the date that those trees sprouted?

A.   What I did first, my initial visit to the property before I started doing anything else was I selected what I thought were trees that were marginal that probably germinated after 1969 and bored with an increment, bore a bunch of several different trees of each species and could not find a single tree that was 12 inches.  That is what I used as my break-level point that germinated before 1969.

So every tree that I did look at that was merchantable this summer germinated prior to '69.

I then went back onto the property and took a series of plots of those trees that germinated after Matson's harvest of '85 and on.

Q.   All right.  So none of the trees that are merchantable germinated after 1969, that was your testimony?

A.   Very, very small percentage of them were six and seven inches.

Q.   That would not be merchantable?

A.   That is pulp wood size, but that is a minor amount.

Q.   Okay.  How many dollars worth of merchantable trees were

1    there that have germinated since 1969?

2    A.   If I may look up my data here.  At this moment, $6 an

3    acre.

4    Q.   At $6 an acre?

5    A.   Yes.

6    Q.   How many forests of acres are there?

7    A.   I was considering about 700 that we were considering that

8    were not in the waterways.

9    Q.   Now, in terms of the waterways, that issue was presented

10   in the prior litigation in this case, do you recall?

11   A.   Correct.

12   Q.   And the jury made a determination that there was a

13   100-foot set-back, a no-cut zone in essence, from waterways on

14   the property, is that correct?

15   A.   I don't know that they called it a no-cut zone.  That was

16   an area that belonged to Mr. Carlisle, and if you read the

17   contract, I think it doesn't say no cut on there, but what

18   they determined was Spring Creek, Toms Run -- well, they first

19   said all waterways including Spring Creek and Toms Run, those

20   are almost the exact words the jury said.

21   Q.   They determined there was a 100-foot no-cut zone on either

22   side of the waterways, is that correct?

23   A.   They determined there was a 100-foot zone on the waterways

24   that belonged to Mr. Carlisle.

25   Q.   Did they make any determination about who owned the timber

1   in that no-cut zone?

2   A.  In a sense, yes, sir, because they reimbursed Mr. Carlisle

3   for the timber that Matson had cut in there.

4   Q.  In the no-cut zone?

5   A.  In the zone owned by Mr. Carlisle.

6   Q.  Do you recall if there was a specific interrogatory

7   submitted to the jury as to who owned the timber in the no-cut

8   zone?

9   A.  No, I do not.

10  Q.  Are you aware that the prior action went to the jury on a

11  basis of what's called a declaratory judgment?

12  A.  I don't know what that means.

13  Q.  Were you aware that the complaint in the prior action only

14  asked the Court to declare what Matson's rights were and not

15  what Mr. Carlisle's rights were?

16  A.  I don't know how to answer that.

17  Q.  Were you aware that the verdict slip only determined what

18  Mr. Matson's rights were and not Mr. Carlisle's rights?

19  A.  No, sir.  There was a verdict that described

20  Mr. Carlisle's rights too, at least I thought there was.

21  Q.  You said approximately 700 acres at $6 an acre for the

22  pulp wood on the property?

23  A.  That would be at this moment, yes.

24  Q.  That's about $32,000?

25  A.  That would be $4,200.

1  Q.  $4,200, okay.  So all the merchantable timber which was

2  sprouted after 1969 is only worth $4,200?

3  A.  At this moment.

4  Q.  You're not projecting what it could be worth at some point

5  in the future?

6  A.  I can suggest that and project that, yes.

7  Q.  Now, do you recall testifying in the prior case that there

8  was very little high quality timber left on the property?

9  A.  Where Matson had harvested, that's correct.

10 Q.  Do you recall testifying that all trees over 16 inches

11 were low quality?

12 A.  Where he had harvested, that's correct.

13 Q.  And do you recall testifying that all trees left had low

14 values?

15 A.  Where he had harvested, that's correct.

16 Q.  Did you make a qualification that your testimony only

17 related to Mr. Matson had harvested or did you make

18 representations about the entire property in your prior

19 testimony, if you recall?

20 A.  I think we were just talking about where he had harvested.

21 That's a good many years ago when we had this case.

22 Q.  In fact, some of the trees that were on the property in

23 1969, despite your prior testimony, had substantial value, did

24 they not?

25 A.  And they still do, yes.

1    Q.   In fact, you recently conducted a timber harvest out on

2    that property, did you not?

3    A.   Correct.

4    Q.   And that timber harvest was conducted on trees that were

5    born before 1969, was it not?

6    A.   Every one of them.

7    Q.   In fact, the timber harvest you conducted were trees that

8    this Court had previously ruled belonged to Matson, were they

9    not?

10   A.   No, sir.

11   Q.   Why do you say that, sir, if they were born before 1969?

12   A.   Because they were within a hundred feet of a waterway.

13   Q.   Who advised you they were within 100 feet of a waterway?

14   A.   I used Matson's standards to qualify that.

15   Q.   And what are those standards, sir?

16   A.   The waterways that they designated and how they designated

17   them.

18   Q.   And who told you how they designated them?

19   A.   I saw the flagging right on the ground, I saw what they

20   did, what their forester had done.   I was witness to that.   I

21   walked a lot of those, yes.

22   Q.   And the forester told you he was flagging what Matson

23   considered waterways?

24   A.   Yes.

25   Q.   Do you know the name of that forester?

1  A.  I do.  He doesn't work for Matson any longer, but I'm

2  trying to think of his name.

3  Q.  In fact, the timber you took from the property was the

4  highest grade timber on the whole property, was it not?

5  A.  One tree was.

6  Q.  And, in fact, you timbered in some wetlands?

7  A.  We did not.

8  Q.  You didn't timber in any wetlands?

9  A.  Not in the wetlands, no, sir.

10              MR. FRYLING:  Your Honor --

11              MR. GING:  That is all I have.

12              THE COURT:  Whoa, whoa, whoa.

13              MR. GING:  I'll withdraw the question, Your Honor,

14  and that's all that I have at this point in time.

15              THE COURT:  Okay.  All right.  I'm a little

16  confused here.  You said that the trees that you could clearly

17  identify as being born sprouting after 1969 really don't have

18  much market value today?

19              THE WITNESS:  That's correct.

20              THE COURT:  About $4,500?

21              THE WITNESS:  Yes.

22              THE COURT:  What is it that is worth $330,000 now?

23              THE WITNESS:  What I did -- do you want me to

24  explain that?

25              THE COURT:  Yes.

1          THE WITNESS:  What I did was went in and took a

2    series of plots using a system called Silvah that I took and

3    projected by the grow formula.  It grows not only the tree but

4    it grows in value, too.  I then grew those trees out to what

5    would be a normal age.  We would start to harvest 50 years

6    from now, and I came up with a value per acre then.

7          THE COURT:  The trees are not worth $330,000 today?

8          THE WITNESS:  No, sir.

9          THE COURT:  50 years from now they will be worth

10   $330,000?

11         THE WITNESS:  Oh, my goodness, yes.  They will be

12   worth 5,000 an acre then.

13         THE COURT:  How long before they are worth 75,000?

14         THE WITNESS:  I can't answer that.  I would have to

15   go back.  What I did -- let me finish.  What I did then, I

16   took that value and went to my bank and said now, how much

17   money would I have to invest at a reasonable rate to yield

18   that kind of an income, and that's where I came up with the

19   value today of that timber that's there.

20         Those trees that are there really have a value.  We

21   as foresters recommend our clients do things like fencing,

22   herbicide treatment and planting, and it's pretty hard to tell

23   a landowner after he spent hundreds of dollars per acre that

24   those trees are worthless, that they are only this high.  They

25   certainly have a value, but you're not going to realize that

1    until 50 years from now.

2         THE COURT:  Okay.  So what you did was calculate

3    how much money would I have to invest today that would yield

4    330,000?

5         THE WITNESS:  Right.  The 330,000 would be what you

6    would need to invest today to yield the value of that timber

7    in 50 years.  I have 388,000 is what it really came out to be.

8    That's how I calculated that.  That's the only way I knew to

9    approach that is to use those trees as an investment, and

10   that's really what they are.  If you would go in and destroy

11   them now, you would lose that much value.

12        THE COURT:  I suppose if a forest fire breaks out,

13   they can burn down next week.

14        THE WITNESS:  That's right.  That's the risk you

15   take.  That's the reason you have such a high yield.

16        THE COURT:  I have trouble putting a value on

17   something that doesn't have that value, that may some day have

18   it.  I have to know how much is in controversy here.

19        MR. FRYLING:  The quit claim deed is essentially a

20   perpetual right in the interest in those timbers and trees.

21   It's the value today and it's reasonably what's the value of

22   having the right to timber those trees in ten years, in 20

23   years.

24        To answer Your Honor's question about how many

25   years before the value reaches over $75,000 or over, it's 10

1    years just based on the Silvah report per dollars per acre as

2    it sits on the land at that particular time.

3          So today it's worth $6 an acre.  In five years it's

4    worth -- Mr. Hall can perhaps help me out -- $33 an acre.

5    Then Silvah, which is a recognized forestry program, tells you

6    how the species is going to grow, what the diameter is going

7    to be, and what per acre yield is going to be.

8          We're talking about not only what is going to

9    happen today.  Matson is not going to come in and timber that

10   stuff today.  They are going to be waiting 10, 15, 20 years,

11   and whenever that matures, then they are going to come in and

12   based upon the estimates of the forester, take $3.6 million

13   worth of timber off that property if that deed is upheld.

14         What's the value of that $3.6 million today?  In

15   using those forestry programs, we can calculate roughly based

16   on the species of the tree and again, of course, in three

17   years time or ten years time or 20 years time, there could be

18   a forest fire or some other blight that comes in, but it

19   doesn't lessen the value overall.

20         THE COURT:  Well, this is obviously what I'm faced

21   with here is that you don't have a right to challenge the

22   validity of that quit claim deed, is you have the right to

23   challenge it in federal court.

24         MR. FRYLING:  I understand that.

25         THE COURT:  I guess for some reason -- I don't even

1  understand why somebody would want that in federal court.  I

2  have no particular expertise.  These are things state court

3  judges do.

4           MR. FRYLING:  I think part of the reason it's here,

5  Your Honor, is it started here, and a lot of the issues that

6  arose out of this case either arose out of or are a result of

7  the verdict that occurred in 1995.

8           To the extent that both parties are still trying to

9  determine exactly what the jury meant by their verdict and how

10  that verdict was resolved, it seemed to come back to the Court

11  that had the case to begin with may be able to offer more

12  insight, the Court in Warren County.

13          THE COURT:  A rather overzealous assumption on your

14  part.

15          MR. FRYLING:  Perhaps.

16          THE COURT:  You will send in the affidavit on

17  Mr. Hall, a curriculum vitae.  I will look at it and take the

18  matter under advisement.  Let me see counsel in my chambers

19  real quick.

20          (Whereupon, the above hearing was concluded.)

21                         - - -

22

23

24

25

I hereby certify by my original signature herein that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


                    S/__Karen M. Earley
                     Karen M. Earley, RDR-CRR
                     Official Court Reporter